**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEED LIGHTING DESIGN CO., LTD., | No. C 04-2291 SBA |
| Plaintiff, | **ORDER** |
| v. | [Docket Nos. 57, 76] |
| HOME DEPOT, et al., | |
| Defendants. | |

This matter comes before the Court on Defendants Home Depot, Trend Lighting, Corp., and Hampton Bay Fan & Lighting Company's Motion for Summary Judgment [Docket No. 57] and Plaintiff Seed Lighting Design Co., Ltd.'s Ex Parte Application for Leave to File a Supplemental Opposition [Docket No. 76]. Having read and considered the arguments presented by the parties in the papers submitted to the Court, the Court finds this matter appropriate for resolution without a hearing. The Court hereby GRANTS Defendants' Motion for Summary Judgment [Docket No. 57] and DENIES Plaintiff's Ex Parte Application [Docket No. 76].

///

///

# BACKGROUND

**A.     Factual Background**

Plaintiff Seed Lighting Design Co., Ltd. ("Seed Lighting"), a company based in Taiwan, is the owner of a design patent protecting the ornamental features of a dual-head halogen desk lamp, U.S. Design Patent No. 407,519 (the "'519 Patent"). Compl. at ¶¶ 5, 10; Decl. of Richard Darwin ("Darwin Decl.") at Ex. 1.

Home Depot, Inc. ("Home Depot") is a Delaware corporation doing business in numerous districts throughout the United States. Compl. at ¶ 6. Trend Lighting Corp. ("Trend Lighting") is a California corporation that sells wholesale lighting to Home Depot. *Id.* at ¶ 7. Hampton Bay Fan & Lighting Company ("Hampton Bay") is a Delaware corporation that also sells wholesale lighting to Home Depot. *Id.* at ¶ 8. Home Depot and Trend Lighting design, make, use, offer for sale, and sell a line of products under the name Hampton Bay. *Id.* at ¶ 11.

Seed Lighting manufactures a lamp called the "Oligio" lamp (hereinafter referred to as the "Subject Lamp"). The Subject Lamp was featured in the November 1997 issue of *Taiwan Lighting Magazine*. Decl. of Lael D. Beloate ("Beloate Decl.") at Ex. J.

On May 6, 1998, Seed Lighting filed its design patent application for the '519 Patent in the United States. Darwin. Decl. at Ex. 1. The Subject Lamp is the embodiment of the '519 Patent. Seed Lighting does not sell the Subject Lamp directly to consumers in the United States, but instead sells through a single United States distributor, Lite-Source, Inc. ("Lite-Source"). Darwin Decl. at Ex. 2. Lite-Source has an exclusive purchasing agreement with Seed Design to sell the Subject Lamp in the United States. Beloate Decl. at Ex. A, ¶ 3.

The Subject Lamp was depicted in *Home Lighting & Accessories* on or about July 1999 and August 1999. Beloate Decl. at Ex. I. In both the *Taiwan Lighting Magazine* and *Home Lighting & Accessories* publications, Lite-Source is listed as the sole source of the Subject Lamp. *Id.* at Exs. I, J.

In 2000 and 2001, Lite-Source sold the Subject Lamp to the Great Indoors stores. *Id.* at Ex. A, ¶ 9. Lite-Source also sold the Subject Lamp to the Expo Design Center in 2002. *Id.* at ¶ 8. The Expo Design Center is a division of Home Depot. Beloate Decl. at Ex. O.

1   On or about April 8, 2002, Lite-Source noticed that a lamp that appeared to be identical to the
2  Subject Lamp (hereinafter referred to as the "Hampton Bay Lamp") was also being sold by Home Depot.
3  *Id.* at ¶ 2. Lite-Source later discovered that Trend Lighting was responsible for selling the Hampton Bay
4  Lamp to Home Depot at a substantially lower price. *Id.* at ¶¶ 5, 7.

5   On or about September or October 2002, after reviewing a letter that Seed Lighting sent to Home
6  Depot concerning the Subject Lamp, Trend Lighting attempted to obtain a license from Seed Lighting.
7  Beloate Decl. at Ex. H, H-100:14-101:6. When Trend Lighting was not able to negotiate a license, Trend
8  Lighting stopped selling the Hampton Bay Lamp. *Id.*

**B.  Procedural Background**

On June 10, 2004, Seed Lighting filed a complaint against Home Depot, Trend Lighting, and Hampton Bay setting forth the following causes of action: (1) infringement of the '519 Patent; (2) unfair competition; and (3) trade dress infringement. In the complaint, Seed Lighting alleges that Trend Lighting and Home Depot infringed the '519 Patent by making, using, and selling an infringing desk lamp under the name Hampton Bay. Compl. at ¶ 11. Seed Lighting also alleges that the design and packaging of the Subject Lamp constitute protectable trade dress, and that the Hampton Bay Lamp sold by the Defendants infringes those trade dress rights. *Id.* at ¶¶ 23, 24. Seed Lighting further alleges that Defendants' alleged actions constitute unfair competition. *Id.* at ¶¶ 18-20. On August 13, 2004, Defendants filed an answer to the complaint.

On October 18, 2004, Judge Chesney issued a Pretrial Preparation Order, setting an April 15, 2005 fact discovery deadline. On March 21, 2005, Judge Chesney recused herself from this case. Per the March 21, 2005 Order of Recusal, all pending dates of motions, pretrial conferences, and trial were vacated. All other dates, including dates relating to discovery deadlines, remained in effect.

On March 30, 2005, Plaintiff filed an ex parte application, pursuant to Federal Rule of Civil Procedure 16(b), requesting a continuance of the discovery deadline to May 16, 2005. Plaintiff based its request on the fact that the parties had agreed to delay the initiation of discovery until settlement negotiations were exhausted in an effort to keep the costs of litigation down.[1]

---

[1] The parties met with a Court-appointed mediator on February 17, 2005 but were unable to resolve the case. Defendants propounded numerous written discovery requests on or about March 4, 2005. Defendants also promptly noticed Plaintiff's deposition. Plaintiff did not propound any written

3

On March 31, 2005, Defendants filed a limited opposition to Plaintiff's ex parte motion to extend the discovery deadline. In the opposition, Defendants stated that they did not oppose an extension of the fact discovery deadline to May 13, 2005. However, Defendants requested that the Court impose certain restrictions on further written discovery. Defendants also requested that neither party be permitted to notice any additional depositions to occur after April 15, 2005, with the exception of Plaintiff's deposition, which had already been noticed. Additionally, Defendants requested that the deadline for the disclosure of expert witness reports be continued to May 13, 2005.

On April 11, 2005, the Court granted in part and denied in part Plaintiff's ex parte application. The Court found that Plaintiff had shown good cause warranting a limited extension of the fact discovery deadline to permit the Defendants to conduct a deposition that could not be scheduled prior to the April 15, 2005 cut-off date. However, the Court also found that Plaintiff had not demonstrated good cause warranting an extension of time to propound an unlimited amount of additional written discovery or to conduct additional depositions after the April 15, 2005 deadline. Accordingly, on April 11, 2005, the Court ordered a continuance of the fact discovery cut-off deadline to May 16, 2005. The Court further ordered that each party was permitted to serve the following additional written discovery: (1) no more than ten additional requests for admission; and (2) no more than ten additional requests for documents. Neither party was permitted to serve additional interrogatories. The Court also granted Defendants leave to depose Plaintiff so long as the deposition concluded on or before May 16, 2005. Finally, the Court continued the deadline relating to the exchange of expert witness reports to May 16, 2005.

On May 16, 2005, the parties jointly submitted a stipulation requesting a limited continuance of the fact discovery deadline so that the parties could complete two depositions that had been noticed prior to the original April 15, 2005 discovery deadline. On May 18, 2005, the Court granted the parties' request. Also on May 18, 2005, the Court held a Case Management Conference. On May 20, 2005, the Court issued an Order for Pretrial Preparation (the "Pretrial Order"), setting the matter for a jury trial on September 26, 2005. Pursuant to the Pretrial Order, the fact discovery cut-off was continued to June 17, 2005 and the motion cut-off was set for August 2, 2005.

---

discovery requests until March 11, 2005.

On June 10, 2005, Plaintiff submitted an ex parte application requesting an extension of the fact discovery deadline to July 17, 2005. Plaintiff also requested that the Court extend the expert discovery deadline to an unspecified date "beyond May 31, 2005." In support of its request, Plaintiff stated that: (1) it had been unable to take the deposition of Home Depot despite two previous attempts to notice the deposition because the parties were not able to agree upon a mutually available date; (2) Defendants had failed to produce documents that Plaintiff believed were responsive to Plaintiff's discovery requests; and (3) the parties had been unable to agree on available dates for the depositions of Defendants' designated experts. Defendants opposed Plaintiff's request on the grounds that no further extensions of time were warranted, since Plaintiff had failed to timely serve its written discovery despite two previous extensions granted by this Court. Notwithstanding its objections to Plaintiff's request, however, Defendants agreed to produce Home Depot and its two designated experts for deposition, even after the June 17, 2005 discovery deadline.

On June 16, 2005, the Court granted in part and denied in part Plaintiff's ex parte application. The Court found that Plaintiff had not shown good cause warranting an extension of the fact discovery deadline to July 17, 2005 or an extension of the expert discovery deadline to an unspecified date after July 17, 2005. The Court noted that it had already granted Plaintiff a two-month extension of time within which to complete its discovery. The Court also noted that Plaintiff's failure to complete discovery consistent with the original scheduling order, or during the additional period provided by the prior extension, or to compel further discovery responses pursuant to Federal Rule of Civil Procedure Rule 37, was its own fault. However, since Defendants agreed to make Home Depot and Defendants' two experts available for deposition, the Court granted Plaintiff leave to take these three depositions after the June 17, 2005 deadline.

On June 21, 2005, Defendants filed a Motion for Summary Judgment. Defendants' Motion for Summary Judgment was noticed for a July 26, 2005 hearing date. On June 23, 2005, after being informed by the Court that the July 26, 2005 hearing date was not available, Defendants filed an ex parte application requesting that the Court allow Defendants' Motion for Summary Judgment to be heard on July 26, 2005. On June 28, 2005, the Court granted Defendants' ex parte application.

Pursuant to the Court's standing orders, Plaintiff's opposition to Defendants' Motion for Summary Judgment was due on July 5, 2005. However, on July 5, 2005, instead of filing an opposition, Plaintiff

submitted an ex parte application requesting a one-week extension of time to file the opposition brief. In the ex parte application, Plaintiff stated that it was not able to comply with the July 5, 2005 deadline because it did not begin preparing its opposition brief until June 28, 2005.

On July 5, 2005, the Court issued an order denying Plaintiff's ex parte application. However, the Court granted Plaintiff a brief extension of time to file its opposition brief, such that the brief was due on or before July 7, 2005. In denying the ex parte application, the Court noted that Plaintiff had a history of failing to act diligently and had repeatedly failed to meet the Court's deadlines. The Court also reminded Plaintiff that, given the August 2, 2005 motion cut-off deadline and the September 2005 trial date, Plaintiff was expected to be in the position to readily respond to any dispositive motions filed by the Defendants.

On July 21, 2005, Plaintiff filed an ex parte application requesting leave to file a supplemental opposition to Defendants' Motion for Summary Judgment.[2] On that same date, Defendants filed their opposition to Plaintiff's ex parte application.

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, a court may properly grant a motion for summary judgment if the pleadings and materials demonstrate that there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment may be granted in favor of a defendant on an ultimate issue of fact where the defendant carries its burden of "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989).

To withstand a motion for summary judgment, the non-movant must show that there are genuine factual issues which can only be resolved by the trier of fact. *Anderson*, 477 U.S. at 250. The nonmoving party may not rely on the pleadings but must present specific facts creating a genuine issue of material fact. *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The court's function, however, is not to make credibility determinations. *Anderson*, 477 U.S. at 249. The inferences to be drawn from the

---

[2] Plaintiff's proposed supplemental opposition was filed concurrently with the ex parte application.

United States District Court
For the Northern District of California

facts must be viewed in a light most favorable to the party opposing the motion. *T.W. Elec. Serv.*, 809 F.2d at 631.

## ANALYSIS

**I.    Defendants' Motion for Summary Judgment**

    **A.    Trade Dress Infringement**

In order for a plaintiff to prove a claim for trade dress[3] infringement, the trade dress holder must be able to prove: (1) that its claimed dress is non-functional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendants' product creates a likelihood of confusion. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001). Here, in the instant Motion for Summary Judgment, Defendants state that they are entitled to summary judgment on Plaintiff's trade dress claim because the undisputed facts show that Plaintiff cannot establish the second factor of trade dress infringement: secondary meaning.

"The trade dress of a product . . . attains secondary meaning when the purchasing public associates the dress with a particular product." *Id.* at 1262. The elements making up the trade dress "must have been used in such a manner as to denote product source." *Id.* Thus, a product feature whose impact is only "decorative and aesthetic, with no source-identifying role, cannot be given exclusive rights under trade dress law." *Id.* "[P]roof of secondary meaning entails vigorous evidentiary requirements." *Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC*, 259 F.3d 25, 43 (1st Cir. 2001). "The only direct evidence probative of secondary meaning is consumer surveys and testimony by individual consumers." *Id.*

In support of its Motion for Summary Judgment, Defendants have submitted a survey conducted by their expert, James Berger,[4] which is intended to demonstrate that the Subject Lamp has not acquired any

---

[3]"Trade dress refers generally to the total image, design, and appearance of a product and may include features such as size, shape, color, color combinations, texture, or graphics." *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001).

[4]Mr. Berger has been a faculty member of Northwestern University since 1986. Berger Decl. at ¶ 2. He received his Master's Degree in Business Administration from the University of Chicago Graduate School of Business in 1978, with concentrations in marketing and finance. *Id.* In addition to the numerous graduate and undergraduate classes Mr. Berger has taught at Northwestern University, Roosevelt University's Walter E. Heller College of Business Administration, DePaul University's College of Commerce, the Lake Forest Graduate School of Management, and the University of Illinois at Chicago, Mr. Berger is also a Principal of James T. Berger/Marketing Strategis, a strategic marketing communications and consulting firm. *Id.*

secondary meaning. *See* Decl. of James Berger ("Berger Decl."). As described in the survey, at Mr. Berger's direction, 150 consumers were interviewed in three separate shopping malls around the country. Berger Decl. at Ex. 1. Each person who participated in the survey was prequalified as someone who had actually purchased a desk or table lamp in the last five years. *Id.* The participants were shown six desk and table lamps, including the Subject Lamp, and were asked to identify the source of the lamps, to the extent that they were able to do so. *Id.* None of the consumers surveyed identified Seed Lighting as the source of the Subject Lamp. *Id.*

In its opposition, Seed Lighting argues that the Berger survey is inadmissible and that it should be given no weight because (1) Mr. Berger conducted the survey without a "screening questionnaire"; (2) Mr. Berger let the interviewers "wing it"; (3) Mr. Berger's survey questions were biased, ambiguous, and compound.

In evaluating a survey, a Court must first determine whether the survey is admissible. *Clicks*, 251 F.3d at 1263. This involves an analysis of whether the survey is relevant, supported by proper foundation, and conducted according to accepted principles. *Id.* Once the survey is admitted, issues of methodology, survey design, reliability, the experience and reputation of the expert, and critique of conclusions go to the weight of the survey. *Id.* Here, Seed Lighting fails to articulate in any way how the survey is inadmissible. Having reviewed the expert report and the methodology set forth therein, the Court concludes that the survey is, in fact, relevant and admissible. Indeed, although consumer surveys are often subject to criticism and varying interpretations, they are a routine and well-established method for presenting evidence as to secondary meaning. *See Excelligence Learning Corp. v. Oriental Trading Company, Inc.*, 2004 WL 2944048 (N.D. Cal. 2004) (citing *Clicks*, 251 F.3d at 1262). Accordingly, courts have consistently found that "[a]n expert survey of purchasers can provide the most persuasive evidence on secondary meaning." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th Cir. 1985).

With respect to Seed Lighting's attack on the weight of the survey, these criticisms are equally without merit. First, the undisputed evidence shows that the participants in the survey were pre-screened and that the survey was carefully designed to target only those individuals who had purchased either a table or desk lamp within the past five years. Berger Decl. at Ex. B. Seed Lighting's contention that the interviewers were expected to "wing it" is also false, and blatantly ignores the fact that the interviewers were provided with a written questionnaire. *Id.* Seed Lighting also fails to explain how the survey questions were "biased" or how the questions were so ambiguous that they rendered the survey unreliable. To the contrary, the questions are

8

undisputedly straightforward and are precisely the type of questions that should have been asked. *See, e.g., Excelligence*, 2004 WL 2944048 at * 10 ("The survey tested whether the participants could identify the source of each [product] from its appearance. This is *exactly* the appropriate equation to ask when attempting to determine whether a particular [product's] trade dress has secondary meaning.").

Seed Lighting's alternative argument that the survey was fundamentally flawed because it targeted consumers, rather than "private label wholesalers," has been consistently rejected by the Ninth Circuit. *See Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995) (stating that declarations submitted by an entity's wholesalers are not probative); *see also International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993) ("a product's trademark or trade dress acquires a secondary meaning when the *purchasing public* associates the mark or dress with a single producer or source") (emphasis added). Indeed, as stated by the Ninth Circuit in *Self-Realization*, "[a]ttestations from persons in close association and intimate contact with the trademark claimant's business does not reflect the views of the purchasing public." *Id.* (internal quotations omitted).

Since the Berger survey is the only direct evidence in the record regarding secondary meaning, and purportedly establishes that the purchasing public does not associate the Subject Lamp with Seed Lighting, Seed Lighting has the burden of presenting sufficient circumstantial evidence of secondary meaning to create a triable issue of material fact on this issue. *See, e.g., Excelligence*, 2004 WL 2944048 at * 10. In this regard, however, Seed Lighting's opposition brief is utterly deficient.

For example, Seed Lighting first argues that it can establish secondary meaning because it has enjoyed the exclusive use of the Subject Lamp since 1997. However, this alone, is not sufficient to prevent summary judgment of its trade dress claim. *See Excelligence*, 2004 WL 2944048 at * 10. "Proof of secondary meaning requires at least *some* evidence that consumers associate the trade dress with the source. Although evidence of pervasiveness of the trade dress may support the conclusion that a mark has acquired secondary meaning, it cannot stand alone." *Yankee Candle Co.*, 259 F.3d at 43 (affirming summary judgment for the defendant on issue of secondary meaning despite the plaintiff's extensive evidence regarding advertising, exclusive use, and high volume of sales). Although Seed Lighting's alleged period of exclusive use could have provided ample time for its design to obtain secondary meaning, "secondary meaning cannot emerge in a vacuum." *See, e.g., Continental Laboratory Products, Inc. v. Medax Int'l, Inc.*, 114 F.Supp.2d 992, 1005-

1006 (S.D. Cal. 2000).

Here, the undisputed evidence confirms that Seed Lighting made *no* effort to create secondary meaning during its alleged period of exclusive use of the Subject Lamp. For example, as Defendants note:

- Seed Lighting never stamped or otherwise affixed its name or logo to the Subject Lamp. *See* Darwin Decl. at Ex. 3 (Resp. to Request for Admission ("RFA") No. 2); *see also* Darwin Decl. at Ex. 4 (Depo. of Meiric Chen ("Chen Depo.") at 179:23-180:11).

- Seed Lighting never advertised the Subject Lamp in the United States. *See* Darwin Decl. at Ex. 4 (Chen Depo. at 165:11-25).

- Seed Lighting never advertised at all in the United States. *See id.* (Chen Depo. at 179:15-18).

- Seed Lighting never attended trade shows in the United States. *See id.* (Chen Depo. at 179:119-21).

- Seed Lighting never sold the Subject Lamp directly to consumers in the United States. *See id.* (Chen Depo. at 150:20-25).

- The Subject Lamp is only advertised in the United States as a Lite-Source product, not as a product made by Seed Lighting. *Id.* (Chen Depo. at 164:5-8, 165:11-25).

- The founder of Seed Lighting does not believe that consumers in the United States are even aware of Seed Lighting. *Id.* (Chen Depo. at 179:23-180:11).

Accordingly, there is no evidence that any of Seed Lighting's sales, advertising, or promotional activities created an association between the Subject Lamp and Seed Lighting in the mind of the consumer. In light of this overwhelming evidence, Seed Lighting cannot establish secondary meaning merely by alleging that Defendants intentionally copied the Subject Lamp. *See Excelligence*, 2004 WL 2944048 at * 11. While it is true that, "in appropriate circumstances, deliberate copying may suffice to support an inference of secondary meaning," *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 844 (9th Cir. 1987), in order to make this finding, the deliberate copying *must be* an intentional attempt to capitalize on a company's reputation or goodwill. *See id*. (requiring a finding that the plaintiff's name was "adopted deliberately with a view to obtain some advantage from the good will, good name, and good trade which another has built up . . . [and an indication] that he expects confusion and resultant profit."). Indeed, as the First Circuit noted in *Yankee Candle Company*, mere attempts to copy a product are not necessarily probative, since the copier may very well be exploiting a particularly desirable feature, rather than seeking to confuse consumers as to the source of the product. *Yankee Candle Company*, 259 F.3d at 45. Thus, the relevant intent is not just the intent to copy, but, rather, the intent to "pass off" one's goods as those of another. *Id.* Seed Lighting has made no such

showing here.

Last, the Court notes that Defendants have also argued that Seed Lighting cannot establish protectable trade dress rights in the packaging of the Subject Lamp because: (1) the packaging does not appear to belong to Seed Lighting; and (2) the box in which the Subject Lamp is sold explicitly identifies Lite-Source as the source of the lamp. *See* Darwin Decl. at Ex. 8. These facts appear to be beyond dispute, as Seed Lighting's name is clearly not mentioned *anywhere* on the Subject Lamp or the Subject Lamp's packaging. Additionally, Seed Lighting utterly fails to address this issue in its opposition. Accordingly, the Court concludes that Seed Lighting has conceded this point.

Because the Court finds that Seed Lighting has not established that the Subject Lamp has acquired secondary meaning, Defendants are entitled to summary judgment on the trade dress infringement claim. *See, e.g., Excelligence*, 2004 WL 2944048 at * 11.

### B.     Patent Infringement

Defendants have also moved for summary judgment on Seed Lighting's patent infringement claim on the grounds that Seed Lighting's design patent is invalid for non-enablement.

A design patent protects the nonfunctional aspects of an ornamental design as shown in the patent. *Elmer v. ICC Fabricating, Inc.*, 67 F.3d 1571, 1577 (Fed. Cir. 1995); *see* 35 U.S.C. § 171 (providing that a patent may be obtained for the ornamental design of an article of manufacture). "A patented design is ordinarily claimed 'as shown,' that is, by its drawing." 35 U.S.C. § 171; *Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.*, 162 F.3d 1113, 1116 (Fed. Cir. 1998).

To be valid, design patents must comply with the requirements of section 112 of the United States Patent Code. The second paragraph of § 112 provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctively claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112(2). "Determining whether a claim is definite requires an analysis of whether one skilled in the art would understand the bounds of the claim when read in light of the specification." *Personalized Media Communications v. Int'l Trade Comm'n*, 161 F.3d 696, 706 (Fed. Cir. 1998). Because, in a design patent, "the drawings or photograph constitute[] the entire visual disclosure of the claims[,] it is of utmost importance that the drawing or photo be clear and complete, and that *nothing* regarding the design sought to be patented is left to conjecture." *See* Manual of Patent Examining Procedure § 1503.2.

11

1   Here, since the '591 Patent survived the full patent examination process, it is presumed valid pursuant to 35

2   U.S.C. § 282. Defendants must therefore prove their invalidity defense by clear and convincing evidence.

3   *Abbott Lab. v. Geneva Pharm., Inc.*, 182 F.3d 1315, 1318 (Fed. Cir. 1999).

4           To meet their burden of proof, Defendants have cited to a report prepared by their expert, Cooper

5   Woodring,[5] as well as certain admissions made by the inventor of the lamp, Meiric Chen. For example,

6   Defendants contend, and Seed Lighting does not dispute, that Mr. Woodring and Mr. Chen are experts skilled

7   in the art of industrial design. Defendants further contend, and Seed Lighting does not dispute, that Mr.

8   Woodring has identified certain mistakes and ambiguities in the drawings of the '591 Patent.[6] Defendants also

9   contend, and Seed Lighting does not dispute, that Mr. Chen has conceded that, due to certain ambiguities in

10  the '519 Patent's drawings, even he cannot clearly articulate the precise scope of the patent.

11          As Mr. Woodring explains in his report, the '519 Patent consists of one claim, which itself consists of

12  ten separate figures on six drawing sheets. *See* Cooper Decl. at Ex. 1. The mistakes and ambiguities in the

13  Patent's drawings fall within three of the six major components of the Subject Lamp: (1) the base, (2) the

14  shades, and (3) the disk at the top of the vertical rods. *Id.* These components contain the following

15  inconsistencies and flaws:

- The base of the Subject Lamp is depicted as a thin, flat, disk-like plate in Figure 1 and as a raised, domed shape in Figures 2 and 3.

- The underside of the Subject Lamp is depicted in Figure 8 as having a specific edge and wall thickness around the perimeter of the shade and in Figure 5 as consisting of a solid surface with no edge or wall thickness.

- The disk at the top of the vertical rods of the Subject Lamp is shown in Figure 1 as having the same outer dimension as the square formed by the "sliders" that move the shades up and down and in Figure 4 as being small enough to fit within the square formed by those sliders.

*Id.*

Due to these inconsistencies, after reviewing the '591 Patent during his deposition, Mr. Chen – the *inventor* of the patent – agreed that he could not determine whether the base of the claimed lamp was a flat

---

[5] Mr. Woodring is an industrial designer engineer with 43 years experience in the industry. Decl. of Cooper Woodring ("Woodring Decl.") at ¶ 2. Mr. Woodring has a Bachelor's Degree and a Master's Degree in Industrial Design and has received over 25 design and utility patents. *Id.*

[6] Defendants also point out that Mr. Woodring's report has not been rebutted – and more importantly – cannot be rebutted by Seed Lighting at trial because Seed Lighting has failed to retain or disclose a rebuttal expert on this issue.

12

disk or a rounded dome. *See* Darwin Decl. at Ex. 4 (Chen Depo. at 142:10-14; 143:5-14). Mr. Chen also stated in his deposition that Figure 5 of the '591 Patent - which appears to show a solid surface with no edge – is not supposed to depict a solid surface, but, rather, the underside of the shade. *Id.* (Chen Depo. at 144:1-10).

In its opposition, Seed Lighting does not identify a single piece of evidence or testimony that would demonstrate to the Court that a person skilled in the art would understand the bounds of the '519 Patent's claim. To the contrary, even Seed Lighting's *own* witness appears to agree that the patent drawings are flawed and unclear. Further, Seed Lighting's sole response to Defendants' evidence is that "the slight differences or vagaries contained within the nine figures which make up the '519 Patent are so insubstantial and inconsequential as to render Home Depot's indefiniteness argument meaningless." Opp. at 8. The bare, unsupported belief of Seed Lighting's *counsel* that the vagaries are "insubstantial," however, is not sufficient to overcome summary judgment. *T.W. Elec. Serv.*, 809 F.2d at 630 (nonmoving party must present specific facts creating a genuine issue of material fact). Without any evidence, facts, or expert testimony, the Court finds that Seed Lighting has utterly failed to demonstrate the existence of genuine factual issues sufficient to preclude summary judgment on its patent claim. *Anderson*, 477 U.S. at 250.

### C.     Unfair Competition

Defendants have also moved for summary judgment on Seed Lighting's unfair competition claim. After correctly observing that Seed Lighting's complaint does not reference either the common law or a specific statute as the basis for Plaintiff's "unfair competition" claim, Defendants state that they have construed the claim as arising under § 1125(a) of the Lanham Act. *See* 15 U.S.C. § 1125.[7] While it appears that Seed Lighting's unfair competition claim is actually premised on its patent infringement theory,[8] it is fair to say that to prevail on its unfair competition claim, Seed Lighting must be able to show *either* trade dress infringement *or* patent infringement. Since the Court has concluded that Defendants are entitled to summary judgment on both the trade dress infringement and the patent infringement claims, the Court finds that Defendants are entitled to

---

[7] Seed Lighting fails to address this point in its opposition.

[8] For example, in paragraph 18 of the complaint, Seed Lighting alleges that "[t]hrough their infringement of the patent-in-suit, defendants HOME DEPOT, HAMPTON BAY and TREND have wrongfully diverted and secured sales, monies, and profits which rightfully should have been made by plaintiff." Compl. at ¶ 18.

summary judgment on the unfair competition claim as well.

## II. Plaintiff's Ex Parte Application

On July 21, 2005, Seed Lighting filed an ex parte application requesting leave to file a supplemental opposition to Defendants' Motion for Summary Judgment. In the ex parte application, Seed Lighting argues there is "good cause" for leave to file a supplemental brief because it was "not adequately able to argue its opposition without the testimony of the trade dress expert, whose survey the defendants' motion for summary judgment as to trade dress primarily relies." Seed Lighting states that it did not take the deposition of Defendants' patent expert until July 6, 2005 and did not take the deposition of Defendants' trademark expert until July 14, 2005. Seed Lighting further states that its supplemental opposition "would be limited to the deposition testimony of defendants' expert who conducted the secondary meaning survey."

Also on July 21, 2005, Defendants filed an opposition to Seed Lighting's ex parte application. In their opposition, Defendants state that: (1) as a matter of professional courtesy, Defendants agreed to make their experts available for deposition prior to date Seed Lighting's opposition brief was due, even though Seed Lighting had failed to properly notice these depositions prior to the discovery cut-off; and (2) despite being given multiple opportunities to do so, Seed Lighting failed to take the depositions of Defendants' experts until mid-July. In support of their opposition, Defendants provide the Court with correspondence between counsel for Seed Lighting and Defendants, which shows that Defendants did, in fact, make their experts available for deposition on several occasions in June 2005. Defendants further argue that they will be severely prejudiced if Seed Lighting is allowed to provide supplemental briefing on the Motion for Summary Judgment, especially in light of the fact that Seed Lighting filed its ex parte application only three Court days prior to the scheduled hearing date.

Having considered the ex parte application and Defendants' opposition to the ex parte application, the Court finds that Seed Lighting's ex parte application is untimely and lacks merit. Specifically, the Court finds that: (1) Seed Lighting has not shown good cause as to why it should be permitted to file a supplemental brief; and (2) Seed Lighting has failed to demonstrate why it was not able to obtain the relevant discovery at an earlier date through the exercise of diligence. Further, the fact that Seed Lighting did not move for a continuance of the Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(f) at the time it filed its initial opposition to Defendants' Motion for Summary Judgment is fatal to its claim that such discovery should now

be considered by this Court. *See Brae Transp., Inc. v. Coopers & Lybrand*, 790 F.2d 1439, 1443 (9th Cir. 1986) ("Failure to comply with the requirements of Rule 56(f) is a proper ground for denying discovery and proceeding to summary judgment.")[9]

Moreover, even if this Court were to construe the ex parte application as an untimely Rule 56(f) motion, Seed Lighting has failed to show that a continuance is warranted. Although Rule 56(f) allows the Court to grant a continuance when a party opposing summary judgment wishes to conduct further discovery, the Court may properly deny the request if the movant has failed diligently to pursue discovery in the past, *Mackey v. Pioneer National Bank*, 867 F.2d 520 (9th Cir. 1989), or if the movant fails to show how the information sought would preclude summary judgment. *California Union Ins. Co. v. American Diversified Sav. Bank*, 914 F.2d 1271, 1278 (9th Cir. 1990) (citing *Hall v. State of Hawaii*, 791 F.2d 759, 761 (9th Cir. 1986)).

Here, Seed Lighting has a well-documented history of failing to diligently pursue its discovery opportunities. In fact, Seed Lighting has offered no reason why it was not able to take the deposition of Mr. Berger prior to the initial expert discovery cut-off deadline or during the numerous extensions of time given to it to complete its discovery. In fact, it appears that Defendants and Seed Lighting discussed the scheduling of Mr. Berger's deposition as early as May 25, 2005, but that Seed Lighting nevertheless declined to notice Mr. Berger's deposition prior to the discovery deadline. It further appears from the papers submitted to the Court that Defendants granted Seed Lighting several opportunities to take the deposition of Mr. Berger in June, notwithstanding Seed Lighting's failure to comply with the relevant deadlines, but that Seed Lighting continued to postpone its decision to take the deposition of Mr. Berger in an effort to avoid the costs of litigation.

Further, and most significantly, even if the Court were to consider the supplemental opposition, it fails to show that Defendants are not entitled to summary judgment. Summary judgment may be granted in favor of a defendant on an ultimate issue of fact where the defendant carries its burden of "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325; *see Johnston v. IVAC Corp.*, 885 F.2d 1574, 1577 (Fed. Cir. 1989). Here, the supplemental opposition

---

[9] Indeed, although Plaintiff did state in its opposition brief that it was still in the process of conducting depositions, *see* Opp. at 4:14-17, Plaintiff failed to move for a continuance of the hearing on this basis or to otherwise argue to the Court that the on-going depositions were likely to produce facts relevant to its opposition to the Motion for Summary Judgment. *See Brae Transp., Inc.*, 790 F.2d at 1443 ("References in memoranda and declarations to a need for discovery do not qualify as motions under Rule 56(f).")

makes clear that Plaintiff has no evidence sufficient to carry its burden of proof on the trade dress infringement claim.

As set forth herein, *supra*, in a trade dress infringement claim, the ***plaintiff*** bears the burden of proof and must be able to establish that: (1) that its claimed dress is non-functional; (2) that its claimed dress serves a source-identifying role either because it is inherently distinctive or has acquired secondary meaning; and (3) that the defendants' product creates a likelihood of confusion. *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1258 (9th Cir. 2001). Defendants' Motion for Summary Judgment is premised on the fact that Plaintiff cannot establish an essential element of its trade dress claim, *i.e.* that the Subject Lamp has acquired a secondary meaning. In support of this argument, Defendants have conducted their own consumer survey, and have *also* shown that: (1) Seed Lighting never stamped or otherwise affixed its name or logo to the Subject Lamp; (2) Seed Lighting never advertised the Subject Lamp in the United States; (3) Seed Lighting never advertised at all in the United States; (4) Seed Lighting never attended trade shows in the United States; (5) Seed Lighting never sold the Subject Lamp directly to consumers in the United States; (6) the Subject Lamp is only advertised in the United States as a Lite-Source product, not as a product made by Seed Lighting; and (7) the founder of Seed Lighting does not believe that consumers in the United States are even aware of Seed Lighting.

Plaintiff's proposed supplemental opposition focuses solely on one piece of evidence proffered by Defendants, the consumer survey.[10]  Specifically, Seed Lighting argues that: (1) the Berger survey violated the "anonymous source rule"; (2) the Berger survey failed to control for certain variables; (3) the Berger survey had a built-in bias toward Home Depot; (4) Mr. Berger failed to prevent Home Depot employees from participating in the survey; and (5) the Berger survey had a response rate below 50%. Seed Lighting then concludes that Defendants' survey should be afforded little weight. This conclusion only demonstrates that there is no direct evidence that the Subject Lamp has *not* acquired secondary meaning. To overcome the instant Motion for Summary Judgment, however, Plaintiff must establish that there *is* some evidence that the Subject Lamp *has* acquired secondary meaning. The proposed supplemental opposition brief does not establish this. As such, the proposed supplemental opposition brief is insufficient to overcome summary judgment.

---

[10]Significantly, a consumer survey is a piece of evidence that *Plaintiff* should have produced.

16

In sum, Seed Lighting has not demonstrated that good cause warrants consideration of the supplemental opposition. More importantly, however, the supplemental opposition does not alter this Court's ultimate conclusion that Defendants are entitled to summary judgment. Accordingly, the Court DENIES Plaintiff's Ex Parte Application for Leave to File a Supplemental Opposition.

## **CONCLUSION**

IT IS HEREBY ORDERED THAT Defendants' Motion for Summary Judgment [Docket No. 57] is GRANTED.

IT IS FURTHER ORDERED THAT Plaintiff's Ex Parte Application for Leave to File a Supplemental Opposition [Docket No. 76] is DENIED.

IT IS SO ORDERED.

Dated: 8-3-05

SAUNDRA BROWN ARMSTRONG
United States District Judge